**Patricia K. JACOBS**

v.

**Bertram H. JACOBS.**

Supreme Judicial Court of Maine.

Argued Jan. 14, 1986.

Decided April 7, 1986.

Cloutier, Joyce, Dumas & David, P.A., Edward David, (orally), Livermore Falls, for plaintiff.

Marcou & Marcou, Louis R. Marcou, (orally), Waterville, Potter & Jamieson, Roderick H. Potter, Saco, for Amicus Curiae, Coalition Organized for Parental Equality.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, WATHEN and GLASSMAN, JJ.

McKUSICK, Chief Justice.

■ Husband Bertram Jacobs appeals from the divorce judgment entered by the Superior Court (Franklin County) in the divorce action brought by his wife, Patricia Jacobs. He contends (a) that he has a constitutional right to joint or shared custody of the couple's three minor children and that the divorce judgment infringed upon that right by granting primary custody to Mrs. Jacobs; and (b) that the Superior Court abused its discretion in the alimony, child support, and other financial terms of the divorce judgment. On her part, Mrs. Jacobs has cross-appealed from the provision of the judgment by which the husband's obligation to pay alimony is made to terminate upon her cohabitation, as well as upon her remarriage. Because we find no merit in either the husband's appeal[1] or the wife's cross-appeal, we affirm the Superior Court's judgment.

The Jacobses were married in 1971 in Ohio. In August 1972 they moved to Maine where Dr. Bertram Jacobs has ever since held a professorial position in the Psychology Department at the University of Maine in Farmington. The Jacobses have three children, born in 1973, 1975, and 1980, respectively. The family lived together in a home in Farmington until March 1983 when Dr. Jacobs moved out. The next month, Mrs. Jacobs filed a complaint for divorce in the District Court (Farmington), seeking care and custody of the children. Dr. Jacobs filed a counterclaim for divorce, requesting joint custody of the children. Pursuant to M.D.C.Civ.R. 73(b) and 80(k), Dr. Jacobs removed the case to the Superior Court. On May 3, 1985, after a full evidentiary hearing the Superior Court dismissed Dr. Jacobs' coun-

---

**1.** A group calling itself the Coalition for Parental Equality has filed with this court an amicus curiae brief supporting the position of the husband. Under M.R.Civ.P. 75A(f), we receive and consider that brief to the extent, but only to the extent, that it addresses issues raised before the trial court and pursued here by the parties themselves. *See Cannan v. Bob Chambers Ford,* 432 A.2d 387, 389 (Me.1981) ("no reason to depart from the rule of sound appellate practice that the Superior Court should have *every opportunity* to pass on questions and objections raised by the parties" (emphasis in original)); *Chadwick-BaRoss, Inc. v. Martin Marietta Corp.,* 483 A.2d 711, 717–18 (Me.1984) (issue not argued in a party's brief or oral argument in the Law Court is viewed as waived).

terclaim and granted the parties a divorce on the ground of irreconcilable marital differences. At the same time the court allocated parental rights and responsibilities between the parties, giving primary custody of the three children to their mother, with extensive visitation and other rights awarded to the father. The court also made a division of the couple's marital property and ordered Dr. Jacobs to pay his wife alimony and child support.

### I. The Husband's Appeal

### A. Custody of Minor Children

Before he awarded the primary custody of the couple's three children to Mrs. Jacobs, the Superior Court justice expressly determined, as a result of carefully weighing all the relevant factors,[2] that such allocation of parental rights and responsibilities would be in the best interests of the Jacobs children. He also expressly eschewed any "preconceived preference either for or against either party." Although the divorce court justice recognized that both parties had a strong and abiding interest in their children and were capable of caring for them, he found that Mrs. Jacobs, to whom he awarded the family home, offered the kind of stability the children needed at that time. At the same time, the divorce decree gave Dr. Jacobs substantial time with the children and other rights with regard to them.

■ Dr. Jacobs' attack is not upon those findings. He, instead, asserts that the federal and state constitutions required the Superior Court to award custody jointly and equally to him and Mrs. Jacobs since the record did not show by clear and convincing evidence that joint custody would be harmful to the children. In other words, he contends that both constitutions mandate a preference for joint custody, or "shared parental rights and responsibilities" as it is called in 19 M.R.S.A. § 752 (Supp.1985–1986), and that a joint custody arrangement may constitutionally be rejected in favor of allocating the parental responsibilities between the parents in the way the Superior Court justice did in the case at bar, only upon proof by clear and convincing evidence that the constitutionally preferred arrangement would harm the children. We can find nothing in the authorities or in any latent command of our constitutions that supports Dr. Jacobs' contention.

It is unquestionable that any decision terminating or limiting the right of a parent to physical custody of his child affects his "constitutionally protected liberty interest in maintaining his familial relationship with the child." Osier v. Osier, 410 A.2d

2. 19 M.R.S.A. § 752(5) (Supp.1985–1986), which became effective March 31, 1985, provides as follows:

> **5. Best interest of the child.** The court, in making an award of parental rights and responsibilities with respect to a minor child, shall apply the standard of the best interest of the child. In applying this standard, the court shall consider the following factors:
> **A.** The age of the child;
> **B.** The relationship of the child with the child's parents and any other persons who may significantly affect the child's welfare;
> **C.** The preference of the child, if old enough to express a meaningful preference;
> **D.** The duration and adequacy of the child's current living arrangements and the desirability of maintaining continuity;
> **E.** The stability of any proposed living arrangements for the child;
> **F.** The motivation of the parties involved and their capacities to give the child love, affection and guidance;
> **G.** The child's adjustment to the child's present home, school and community;
> **H.** The capacity of each parent to allow and encourage frequent and continuing contact between the child and the other parent, including physical access;
> **I.** The capacity of each parent to cooperate or to learn to cooperate in child care;
> **J.** Methods for assisting parental cooperation and resolving disputes and each parent's willingness to use those methods;
> **K.** The effect on the child if one parent has sole authority over the child's upbringing; and
> **L.** All other factors having a reasonable bearing on the physical and psychological well-being of the child.
>
> See also Costigan v. Costigan, 418 A.2d 1144, 1146–47 (Me.1980).

1027, 1029 (Me.1980). *See also Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978); *Danforth v. State Department of Health and Welfare,* 303 A.2d 794, 796–97 (Me.1973). There is, however, nothing in the United States or the Maine Constitution that requires a divorce court to give a preference to joint custody over other allocations of parental rights and responsibilities. Dr. Jacobs does not cite a single case, from Maine or any other jurisdiction, that has decided the child custody issue as he urges us now to decide it. In *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), one of the cases he relies upon, the Supreme Court held that before the State may terminate all rights of a mother or father in a child, it must prove its case by clear and convincing evidence. *Id.* at 769, 102 S.Ct. at 1403. A divorce action, however, is fundamentally different from an action to terminate parental rights. In a divorce action, where the court cannot avoid deciding the question of post-divorce custody of minor children, the contest is between the parents who stand before the court on an equal footing. In sharp contrast, an action to terminate parental rights involves an unequal battle between a parent and the State, which with its inherently greater resources seeks to cut off forever all legal and physical ties between that parent and the child. The State is not a party litigant in a divorce proceeding,[3] and the public interest is represented there by the divorce court itself, which in its *parens patriae* role, must resolve the custody dispute between the parents in a way "to do what is best for the interest of the child." *Ziehm v. Ziehm,* 433 A.2d 725, 728 (Me. 1981) (quoting *Finlay v. Finlay,* 240 N.Y. 429, 433–34, 148 N.E. 624, 626 (1925) (Cardozo, J.)).

The Maine statutes assure divorcing parents equal footing in the custody contest. "Neither parent has any rights paramount to the rights of the other with reference to any matter affecting [their] children." 19 M.R.S.A. § 211 (1981). Nor may the divorce court "apply a preference for one parent over the other in determining parental rights and responsibilities because of the parent's sex or the child's age or sex." 19 M.R.S.A. § 752(7) (Supp.1985–1986). Unlike the situation in cases like *Santosky,* where a parent is at risk of irretrievably losing all rights to a child in an action prosecuted by the State, in a divorce case there is no need to provide special protection for the familial relation interest of one parent against the other who has the identical interest. There is no reason, as between the contending parents, to give a substantive preference to one post-divorce custodial arrangement over another or to enforce such a preference by the procedural device of requiring an enhanced burden of proof. The standard of proof in a civil case between two private parties is ordinarily preponderance of the evidence, a rule that is departed from only in those rare circumstances where a higher standard of proof is clearly justified for constitutional or other significant policy reasons. *See Taylor v. Commissioner of Mental Health and Mental Retardation,* 481 A.2d 139, 149–52 (Me.1984). We are not persuaded that we should strike off on a course that, as far as either we or counsel can find, no other court has seen fit to pursue.

■ Under our Maine statute, 19 M.R.S.A. § 214(6) (Supp.1985–1986), the Superior Court was required to

> award allocated parental rights and responsibilities, shared parental rights and responsibilities *or* sole parental rights and responsibilities, *according to the best interests of the child.*

(Emphasis added) After fully hearing the testimony of both Dr. Jacobs and Mrs. Jacobs themselves as well as their witnesses,

---

**3.** The statement of *Deblois v. Deblois,* 158 Me. 24, 30, 177 A.2d 199, 202 (1962), that "[t]he State is a party to every divorce action ..." is merely another, more dramatic way of saying that

"[p]ublic policy ... is of extreme importance in its application to all aspects of actions of divorce." *Id.*

the Superior Court justice decided that the best interests of the Jacobs children would be served by awarding allocated, rather than shared, parental rights and responsibilities to their parents. Neither that order nor the statute under which it was entered infringes upon any constitutional rights of Dr. Jacobs.

### B. *The Husband's Ability to Pay*

Dr. Jacobs urges on appeal that the Superior Court erred in setting the financial arrangements between the parties. The court ordered Dr. Jacobs to pay Mrs. Jacobs weekly alimony[4] and child support. In addition, the court divided the marital property and set apart for Mrs. Jacobs the family home subject to a first mortgage indebtedness of $25,000. While the divorce was pending, Dr. Jacobs had tried to encumber the home further by a second mortgage. The court ordered Mr. Jacobs to assume the aggregate indebtedness minus the sum of $25,000. Dr. Jacobs argues that the total financial burden imposed by the alimony obligation on top of that debt and the child support payments is unjust because in total it consumes by his computation "80% of his net income."

A divorce court is vested with broad powers to order one spouse to pay the other alimony so long as the amount is "reasonable" and the court's decree has "regard to [the payor] spouse's ability to pay." 19 M.R.S.A. § 721 (1981); *Bryant v. Bryant*, 411 A.2d 391, 395 (Me.1980). The judgment as to what is reasonable " 'must be the result of the exercise of sound judicial discretion.' " *Id.* (quoting *Capron v. Capron*, 403 A.2d 1217, 1218 (Me.1979)). This appellate court pays great deference to the trial court's determination:

> Unless the Law Court can determine that the court has violated some positive rule

of law or has reached a result which is plainly and unmistakably an injustice that is "so apparent as to be instantly visible without argument," the ruling appealed from must be approved.

*Id.* (quoting *Capron*, 403 A.2d at 1218). Under that standard we cannot say that the Superior Court exceeded its discretion in setting the amount of the alimony and other financial obligations of Dr. Jacobs.

Specifically, Dr. Jacobs contends that the divorce court failed to take into consideration Mrs. Jacobs' ability to contribute to the support of the children and herself. The record, however, discloses that the Superior Court justice did expressly consider Mrs. Jacobs' earning capacity both currently and in the future.

In the proceedings in the Superior Court, neither party asked the court to make specific findings of fact as to Dr. Jacobs' ability to pay. Therefore, on appeal we must assume that the Superior Court "found for [Mrs. Jacobs] upon all issues of fact necessarily involved in [its] ultimate decision which was favorable to [her]." *Harmon v. Emerson*, 425 A.2d 978, 981 (Me.1981). The court heard conflicting evidence as to Dr. Jacobs' actual income, and there was no evidence regarding the payment schedule on the second mortgage because he had not yet made any payments. We thus must assume that the divorce court properly took into account Dr. Jacobs' ability to pay in determining his financial obligations to Mrs. Jacobs. *See Smith v. Smith*, 419 A.2d 1035, 1038 (Me.1980). In the absence of any pertinent factual findings, either requested by the parties or volunteered by the court, we must assume that the divorce court properly resolved the conflicting evidence of Dr. Jacobs' ability to pay. Dr. Jacobs therefore demonstrates no reversi-

---

4. Since the Superior Court's order of alimony is not in terms limited in duration, Dr. Jacobs argues that it is "permanent." From that characterization, he goes on to assert that the decree is erroneous since Mrs. Jacobs may in the future acquire marketable skills that will increase her earning potential. The answer is simple.

When and if a substantial change of circumstances occurs, Dr. Jacobs can obtain a modification of the alimony decree. *See Smith v. Smith*, 419 A.2d 1035, 1037 (Me.1980); 19 M.R.S.A. § 721 (1981). Dr. Jacobs is subject to no "permanent" order to pay alimony.

ble error in the financial arrangements set by the court.

## II. *The Wife's Cross-appeal: Termination of Alimony on Remarriage or Cohabitation*

■ By the Superior Court's order, alimony will terminate if Mrs. Jacobs "remarries or cohabits." On her cross-appeal she contends that the cohabitation condition for alimony termination is invalid and impermissible as the reflection of moral disapproval of a life style, rather than the recognition of a relevant change in the wife's circumstances. We reject her contention, which is based upon a misreading of the decree.

There is no possible question as to the validity of a divorce decree terminating alimony upon remarriage of the payee spouse. *See Bubar v. Plant,* 141 Me. 407, 410–11, 44 A.2d 732, 734 (1945). The Superior Court justice in joining cohabitation with remarriage as a condition for the end of alimony was concerned with protecting the integrity and assuring the practical enforceability of his termination order. In the context of the whole phrase "remarries or cohabits" in this alimony decree, the term "cohabits" takes on the meaning of maintaining a relationship with another person that is the practical equivalent of marriage. Indeed, such is the dictionary definition of "cohabit"; namely, "To live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people...." *Black's Law Dictionary* 236 (5th ed. 1979). It is apparent that the Superior Court justice was not willing to require Dr. Jacobs to continue paying alimony to his former wife if she and another man should live together as husband and wife, in the sense of their mutually assuming those marital rights, duties, and obligations that are usually manifested by married people. The justice recognized the practical fact that a remar-

riage condition for termination, standing alone, can be readily circumvented. To prevent that circumvention, his decree ordered alimony to stop when the former wife either is legally remarried or maintains a living arrangement that is a marriage except for the ceremonial formality. *Cf. Northrup v. Northrup,* 43 N.Y.2d 566, 571, 373 N.E.2d 1221, 1224, 402 N.Y.S.2d 997, 999 (1978) (rationale behind statute giving the court discretion to terminate alimony where ex-husband proves that the ex-wife is (1) habitually living with another man and (2) holding herself out as his wife although not married to that man, is to prevent a woman from circumventing the loss of alimony by "tailoring her conduct"); *see also Citron v. Citron,* 91 Misc.2d 785, 398 N.Y.S.2d 624 (1977).

The trial justice acted well within the range of allowable discretion in ordering the termination of alimony upon either remarriage or cohabitation. The crafting and enforcement of a divorce decree are guided by equitable principles. The statute that empowers a divorce court to set alimony, 19 M.R.S.A. § 721, expressly declares:

> This section shall not limit the court, by full or partial agreement of the parties or otherwise, from ... limiting or conditioning the alimony award in any manner on terms that the court deems just.

*See Harmon v. Emerson,* 425 A.2d at 983–85; *cf.* H. Clark, *Law of Domestic Relations* § 14.10, at 470 (1968) ("alimony decrees are sufficiently equitable in character to warrant applying equitable principles [such as laches] to problems of enforcement"). In specifying the terms of Dr. Jacobs' obligation to pay alimony, the divorce court was appropriately applying equitable principles of flexibility and adaptability to circumstances. *Cf. Robinson v. Clark,* 76 Me. 493, 495 (1884) ("Equitable remedies are distinguished by their flexibility [and] their adaptability to circumstances"). Mrs. Jacobs has not demonstrated

any positive rule of law that the alimony decree violates, nor has she persuaded us that the result is "plainly and unmistakably an injustice." *Capron v. Capron*, 403 A.2d at 1218.

 Contrary to Mrs. Jacobs' argument, our decision in *Mitchell v. Mitchell*, 418 A.2d 1140 (Me.1980), does not require a different result. The *Mitchell* case arose on the divorced husband's motion to terminate or reduce alimony on the ground that his former wife was living with another man. The motion court in *Mitchell* denied the husband's motion—and we affirmed—simply because the husband failed to prove any change in his former wife's circumstances that justified terminating or reducing alimony. *Mitchell* did not involve the issue that is here critical: May a divorce court condition termination of alimony upon cohabitation, as well as upon remarriage, in order to prevent circumvention of the admittedly valid remarriage condition? When cohabitation is defined to involve the mutual assumption of marriage-like rights, duties, and obligations, as it must be in the context of this alimony decree, we can find nothing legally erroneous in prescribing cohabitation, jointly with remarriage, as a condition for the termination of alimony. We leave to be decided in a concrete fact situation whether the "remarriage or cohabitation" condition in the decree has the effect of later shifting to the alimony payee the burden of proving, or coming forward with evidence, that the payee and a live-in partner have not in fact mutually assumed the rights, duties, and obligations usually manifested by married people.[5]

The entry is:

Judgment affirmed.

All concurring.

---

**5.** *See Patten v. Milam*, 480 A.2d 774, 776 (Me. 1984) (when the "relevant facts are peculiarly within the knowledge of the defendant ... considerations of fairness and convenience strongly support placing the burden of proof on [that party]"); *see also United States v. New York, N.H. & H. R.R.*, 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 214 n. 5, 2 L.Ed.2d 247 (1957); 9 *Wigmore on Evidence* § 2486 (Chadbourne rev. 1981).